**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Northland Insurance Company, | ) | No. CV-04-0347-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Correctional Medical Services, Inc., et al., | ) | |
| Defendant. | ) | |

The court has before it defendants' Motion for Summary Judgment (doc. 98), plaintiff Northland Insurance Company's ("Northland") Response and Cross-Motion for Partial Summary Judgment (doc. 126), defendants' Reply (doc. 131) and Response to Northland's Cross-Motion (doc. 134), and Northland's Reply (doc. 132). We also have before us defendants' Motion to Strike Northland's Cross-Motion as untimely (doc. 129) and Northland's Response (doc. 133) and defendants' Reply (doc. 136).

**I. Background**

Correctional Services Corporation ("CSC") operated the Florence West prison under an agreement with the State of Arizona. Northland insured CSC for liability arising from its operations at Florence West up to a per occurrence limit of $5 million. The State was named as an additional insured under that policy. CSC in turn contracted with defendant Correctional Medical Services, Inc. ("CMS"), whereby CMS agreed to provide medical care

1  to inmates at Florence West.  Under the agreement, CMS employees, including defendants
2  Lorraine Lopez-Moreno, Trina Carrasco and Jacqueline Cornwell (collectively, "Defendant
3  Nurses"), provided medical services at Florence West.  CMS also agreed to maintain liability
4  insurance coverage and to name CSC as an additional insured.  Accordingly, CMS obtained
5  two insurance policies with PHICO Insurance Company covering both itself and its
6  employees:  one policy provided coverage for medical incidents up to $1 million per
7  occurrence, and a second policy provided excess coverage for medical incidents up to $10
8  million.

9  In early 1999, while Jose Valdez was an inmate at the Florence West facility, he
10 received medical care from Defendant Nurses and others and subsequently was rendered
11 permanently blind.  In January 2000, Valdez filed an action in state court against the State
12 of Arizona, CSC and others claiming medical negligence ("Valdez action").  Neither CMS
13 nor the Defendant Nurses were named as defendants in the state court action; however, CSC
14 eventually filed a third-party action against CMS for indemnification.  The State also filed
15 a cross-claim for indemnification against CSC.  These third-party and cross-claims were
16 severed from the main action and ultimately were voluntarily dismissed without prejudice.
17 CSC tendered its defense of the case to CMS, which CMS rejected.  In February 2002,
18 PHICO, was adjudged insolvent and ordered into liquidation, thereby leaving CMS and the
19 Defendant Nurses without insurance coverage for claims arising out of the Valdez action.

20 On the eve of trial, the parties entered into a "high-low" settlement agreement,
21 whereby Valdez agreed to limit any judgment to a maximum of $5 million, and Northland
22 agreed to pay a minimum of $1.5 million, regardless of the jury's damages award at trial.
23 Also pursuant to the agreement, Valdez agreed to dismiss his claims against CSC with
24 prejudice.  With the State the only remaining defendant, the case proceeded to trial on the
25 issue of damages only.  The jury awarded Valdez $6 million, but pursuant to the high-low
26 settlement agreement, the award was reduced to $5 million.  Northland paid $5.7 million (the
27 damages award plus $700,000 in accrued interest) on behalf of the State.
28

## II. Conflict of Laws

A federal district court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941). Arizona state courts apply the principles of the Restatement (Second) of Conflict of Laws to determine which law to apply to substantive issues. Cardon v. Cotton Lane Holdings, Inc., 173 Ariz. 203, 206, 841 P.2d 198, 201 (1992). Section 193 of the Restatement provides, "[t]he validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties." Restatement (Second) of Conflicts of Laws § 193 (2005). The comments to the Restatement provide that the "risk's principal location is the most important contact to be considered in the choice of the applicable law." Id. at § 193 cmt b. Thus, "[t]he location of the insured risk will be given greater weight than any other single contact." Id.; Beckler, 195 Ariz. at 288, 987 P.2d at 774.

The parties agree that Arizona law is applicable to this case. The principal location of the insured risk is Arizona and no other state has a more significant relationship. Therefore, we apply Arizona law.

## III. Guaranty Fund Act

The Arizona Property and Casualty Insurance Guaranty Fund Act, A.R.S. §§ 20-661- 20-680 (2002), ("the Guaranty Act") was established "to assume the liability of insolvent insurers," Betancourt v. Ariz. Prop. & Cas. Ins. Fund, 170 Ariz. 296, 298, 823 P.2d 1304, 1306 (Ct. App. 1991), by establishing a fund to pay "covered claims" up to a maximum amount of $100,000. A.R.S. § 20-667(B). A "covered claim" is an "unpaid claim . . . which arises out of and is within the coverage of an insurance policy . . . , if such insurer becomes an insolvent insurer." Id. at § 20-661(3). However, a "[c]overed claim does not include any

amount due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries or otherwise." Id.

Under section 20-673(C) of the Guaranty Act, where a claimant is insured under more than one insurance policy, the "policy issued by the insolvent insurer shall be deemed to be excess coverage, [and] [t]he claimant shall be required to exhaust all rights under other applicable coverage." Id. at § 20-673(C). The Guaranty Act further states that where other insurance is available, a claimant is not entitled to a duplication of recovery. Instead, any amount paid by another insurer will reduce the amount of recovery available under the Guaranty Act. Specifically, the statute provides:

> Any amount payable on a covered claim pursuant to this article shall be reduced by the amount of such recovery under the claimant's insurance policy. Any recovery pursuant to this article shall be reduced by the amount of the recovery under the claimant's insurance policy.

Id. at § 20-673(A).

Finally, and critical to our analysis here, under the Guaranty Act "[a] member insurer or other insurer, which pays such insurer's own policy, <u>shall have no right of subrogation or recovery against the insured of an insolvent insurer</u>." Id. at § 20-673(A) (emphasis added).

Here, more than one insurance policy was applicable to the Valdez claim–the Northland policy that insured both CSC and the State, and the PHICO policies that insured CMS and CSC. Northland's payment satisfied the entire judgment; therefore, pursuant to section 20-673, any recovery that would have been payable through the fund was reduced to zero.

Northland now seeks indemnity from CMS and the Defendant Nurses by virtue of subrogation for that portion of the $5.7 million judgment it paid, which is attributable to the negligence of CMS employees. Northland Response at 7. Northland contends that the Guaranty Act bars at most $100,000 of its $5.7 million claim. It construes A.R.S. § 20-667, which limits the recovery available under the fund to $100,000, as imposing an identical limit on the section 20-673(A) provision barring an insurer's right of subrogation. In other words,

- 4 -

1  according to Northland's construction of the statute, an insurer's subrogation rights are
2  limited only to the extent of the possible $100,000 recovery.

3    In support of its position, Northland refers to other state statutes that expressly limit
4  the subrogation bar provisions to the coverage limits of the insolvent insurer. See, e.g., Miss.
5  Code Ann. § 83-23-109(f) (the bar provision "preclude[s] recovery . . . to the extent of the
6  policy limits"); Mo. Ann. Stat. § 375.772(7)(c) (the bar provision "shall not apply with
7  respect to those amounts that exceed the limits of the policy"). Northland suggests that the
8  failure of the Arizona Guaranty Act to limit an insurer's subrogation restriction to the policy
9  limits of the insolvent insurer provides a windfall to the insured and operates to violate the
10 due process rights of solvent insurers. According to Northland, because Arizona's statute is
11 silent with respect to the limit on the subrogation restriction, it must have intended the bar
12 provision to be limited to $100,000, the maximum recovery available under the Act.

13   There is nothing in the Act or in any authority cited by Northland to support this
14 proposition. Each of the statutes cited by Northland limits the subrogation bar to the policy
15 limits of the insolvent insured; Northland cites no statute that limits the subrogation bar to
16 the available recovery under the state's guaranty act. Further, Northland's statutory
17 construction is contrary to the plain language of the Guaranty Act, which expressly provides
18 that an insurer, such as Northland, that has made payments under its own policy, shall have
19 no right of subrogation or recovery against the insured (CMS) of an insolvent insurer
20 (PHICO). A.R.S. § 20-673(A). Additionally, Northland's proposed statutory construction
21 directly contravenes the legislative intent of the Arizona Guaranty Act, which is to "avoid
22 delay in payment and financial loss to claimants or policyholders because of the insolvency
23 of an insurer." Bills v. Ariz. Prop. & Cas. Ins. Guar. Fund, 194 Ariz. 488, 491, 984 P.2d 574,
24 577 (Ct. App. 1999).

25   We need not reach Northland's argument that the Guaranty Act's unlimited
26 subrogation bar serves to provide a windfall for insureds of insolvent insurers and violates
27 solvent insurers' due process rights. Here, PHICO issued policies to CMS with total limits
28

- 5 -

of $11 million. Northland's payment of the $5.7 million Valdez judgment is well within the PHICO policy limits.

Accordingly, we conclude that Northland's subrogation claims in Counts I and VI of the Complaint are barred under Arizona law.

## IV. Breach of Contract, Fraud Claims

The defendants also move for summary judgment on Northland's breach of contract and fraud claims, contending that these are merely subrogation claims arising from Northland's payment of the Valdez judgment on behalf of the State, and are therefore barred by the Guaranty Act. In its Complaint, Northland asserts that CMS breached its contract with CSC by (1) failing to provide medical services to Valdez (Count IV), and (2) failing to name CSC as an additional insured on its insurance policy (Count III). Complaint at 17-19.[1] It also claims that CMS committed fraud by (1) failing to name CSC as an additional insured, (2) failing to notify PHICO of CSC's tender of its defenses, and (3) concealing the material fact that PHICO did not have a record of CSC being named as an additional insured (Count IX). Complaint at 25-26. Northland contends that these claims are not barred by the Arizona Guaranty Act because (1) the claims are asserted by way of assignment,[2] rather than subrogation; and (2) the breach of contract and fraud claims are not "covered claims" under the PHICO policy, and therefore do not fall within the purview of the Arizona Guaranty Act. Northland's Response at 14.

---

[1] In its Response, Northland includes allegations of breach of contract not raised in the Complaint. Response at 13. We reject this belated attempt to amend the Complaint and look instead to the Complaint itself for Northland's breach of contract claims.

[2] Defendants contend that CSC's December 5, 2005 assignment is invalid because it was executed long after the Complaint was filed, and after the close of discovery. However, defendants provide no legal justification to invalidate the assignment on this basis. Northland counters that, in any event, the assignment is merely a formal memorialization of a prior agreement between CSC and Northland. Viewed in the light most favorable to Northland, we conclude for purposes of this Motion for Summary Judgment that the assignment of claims to Northland is valid.

- 6 -

Northland's characterization of the indemnification claims as contract claims based on assignment rather than subrogation will not serve to avoid the broad stricture of the Guaranty Act, that an insurer "shall have no right of subrogation <u>or recovery</u> against the insured of an insolvent insurer" for a covered claim. A.R.S. § 20-673(A) (emphasis added). We construe Northland's Count IV breach of contract claim relating to the failure to provide medical services to Valdez as simply a restatement of its subrogation claim, and, as previously discussed, we conclude that it is barred by the Arizona Guaranty Act.

Northland also argues that the remaining breach of contract and fraud claims are not barred by the Guaranty Act because these claims are excluded from coverage under the PHICO policies, and as such, are not covered by the Guaranty Act. The defendants do not dispute this characterization of these remaining claims, but instead argue that the claims should be dismissed because CSC has incurred no liability; therefore, CSC has no valid claims to assign to Northland.

Northland argues, however, that the remaining breach of contract and fraud claims are distinguishable from the subrogation or indemnity claims because they address elements of damages different from the indemnity claims. <u>Northland's Response</u> at 16 n.6. According to Northland, CSC incurred over $70,000 in unreimbursed attorney's fees under its self-insured retention in defending the Valdez action, which it would not have incurred absent CMS's breach of contract and fraud. The defendants deny that CMS breached its agreement to provide additional insured coverage and a defense for CSC, or that Northland incurred attorney's fees and costs unrelated to CSC's independent fault. <u>Defendants' Motion for Summary Judgment</u> at 13 & n.6. These are disputed issues of material fact that we are unable to resolve. Nevertheless, we conclude that the extent of Northland's potential recovery on the remaining breach of contract and fraud claims, if any, is limited to the amount of damages actually incurred by CSC as a result of claims not covered by the PHICO policies. An assignment of CSC's claims to Northland does not provide a basis for Northland to recover the money paid to settle the Valdez action on behalf of the State. Recovery on these amounts is barred by the Arizona Guaranty Act.

In conclusion, because material issues of fact remain with respect to whether CMS provided timely additional insured coverage to CSC, whether CSC properly notified PHICO of CSC's tender of its defenses, and whether failure to provide such timely coverage and notification resulted in any damages to CSC, we deny defendants' motion for summary judgment on Counts III and IX.

Accordingly, **IT IS ORDERED GRANTING IN PART** defendants' Motion for Summary Judgment on Counts I, IV and VI (doc. 98), and **DENYING IN PART** defendant's Motion for Summary Judgment on Counts III and IX (doc. 98).

**IT IS FURTHER ORDERED** denying Northland's Cross-Motion for Partial Summary Judgment (doc. 126) and **DENYING** defendants' Motion to Strike as moot (doc. 129).

DATED this 26th day of January, 2006.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge